# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TERRY O. SULLIVAN,**

      **Plaintiff,**

      **vs.**                                             **Civ. No. 15-1082  KK**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed February 22, 2016 in support of Plaintiff Terry O. Sullivan's *pro se*[3] ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and for Title XVI supplemental security income benefits.   On April 6, 2016, Plaintiff filed his Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 21.)  The Commissioner filed a Response in opposition on July 25, 2016 (Doc. 24), and Plaintiff filed a Reply on August 22, 2016.  (Doc. 28.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 6, 9, 10.)

[3] Because Mr. Sullivan is proceeding *pro se*, the Court construes his pleadings liberally.  *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). The Court does not, however, take on the responsibility of serving as his attorney in constructing arguments. *Id.*

meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

## I. Background and Procedural Record

Claimant Terry O. Sullivan ("Mr. Sullivan") alleges that he became disabled on August 1, 2010, at the age of fifty-four because of spinal arthritis.[4] (Tr. 227.[5]) Mr. Sullivan has a doctorate in Information Science (Tr. 41), and worked as a user interface designer, usability researcher, education research assistant and education project director. (Tr. 228.)

On August 14, 2012, Mr. Sullivan protectively filed[6] applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. (Tr. 16, 213-16.) On June 13, 2013, Mr. Sullivan protectively filed for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.[7] (Tr. 16.) Mr. Sullivan's Title II application was initially denied on September 30, 2012. (Tr. 116-21, 133-35.) Mr. Sullivan's Title II application was denied again at reconsideration on January 29, 2013. (Tr. 123, 124-32, 139-41.) On February 5, 2013, Mr. Sullivan requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 144-45.) The ALJ conducted a hearing on July 9, 2013. (Tr. 58-108.) Mr. Sullivan appeared in person at the hearing with attorney representative Keith Kinzebach. (Tr. 58, 176-77.) The ALJ took testimony from

---

[4] Mr. Sullivan also listed he had been diagnosed with diabetes, but that it had resolved, and that he had occasional irritable bowel syndrome. (Tr. 227.)

[5] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on February 22, 2016.

[6] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[7] Mr. Sullivan's June 13, 2013, application for Title XVI benefits is not in the Administrative Record. The ALJ's determination, however, includes her review of Mr. Sullivan's Title XVI application. (Tr. 25.)

Mr. Sullivan. (Tr. 66-107.) The ALJ continued the hearing so that an orthopedic expert witness could review Mr. Sullivan's most recent x-rays and provide an opinion. (Tr. 107.) The ALJ conducted the continued hearing on October 1, 2013. (Tr. 30-57.) Mr. Sullivan appeared in person at the continued hearing with Mr. Kinzebach. (Tr. 30.) The ALJ took expert testimony from medical expert Peter M. Schosheim, M.D. (Tr. 34-39), Mr. Sullivan (Tr. 39-41), and an impartial vocational expert ("VE"), Paul Prachyl, Ph.D., CRC. (Tr. 41-57.)

On March 10, 2014, the ALJ issued an unfavorable decision. (Tr. 13-25.) In arriving at her decision, the ALJ determined that Mr. Sullivan met the insured status requirements of the Act through December 31, 2012,[8] and that Mr. Sullivan had not engaged in substantial gainful activity since his alleged disability onset date.[9] (Tr. 18.) The ALJ found that Mr. Sullivan suffered from a severe impairment of degenerative disc disease. (Tr. 19.) The ALJ also determined that Mr. Sullivan suffered from non-severe impairments of diabetes mellitus and bilateral degenerative joint disease of the hips. (*Id.*) However, the ALJ found that these impairments, individually or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

Because she found that Mr. Sullivan's impairments did not meet a Listing, the ALJ then went on to assess Mr. Sullivan's residual functional capacity ("RFC"). The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) including: He can occasionally lift, carry, push and pull 10 pounds occasionally and less than 10 pounds frequently; can stand and/or walk 2/8 hours; can sit for 6 hours with normal breaks; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, kneel, crouch, crawl and stoop; he does not have any manipulative

---

[8] To receive benefits, Mr. Sullivan must show he was disabled prior to his date of last insured. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[9] The ALJ noted that Mr. Sullivan had collected $38,159.00 in unemployment benefits from the second quarter of 2011 through the third quarter of 2012, but that it did not amount to substantial gainful activity. (Tr. 18-19.)

limitations and he can reach in all directions without limitations; he must avoid all exposure to vibration and hazards such as dangerous moving machinery and unprotected heights.

(Tr. 20.)  Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. Sullivan was capable of performing his past relevant work as a programmer analyst and information scientist and was therefore not disabled.  (Tr. 24-25.)

On September 22, 2015, the Appeals Council issued its decision denying Mr. Sullivan's request for review and upholding the ALJ's final decision.  (Tr. 1-5.)  On November 25, 2015, Mr. Sullivan timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## II. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[10] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more

---

[10] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Thus, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Id.* at 1009-10.  Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as

significantly probative evidence he rejects."  *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[11] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and

---

[11] 20 C.F.R. pt. 404, subpt. P. app. 1.

the analysis stops.  If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. § 404.1545(a)(1)-(3).  This is called the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work.  20 C.F.R. § 404.1520(a)(4), 404.1520(e).  If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence

of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

## IV. Analysis

### A. Relevant Medical Background

#### 1. Mr. Sullivan's Medical Providers

On October 3, 2008, Mr. Sullivan presented to PAC Paul Halkett for evaluation of lower back pain. (Tr. 410.) Mr. Sullivan described the pain as an ache and reported that he experienced decreased mobility. (*Id.*) Mr. Sullivan said that lying down and/or applying heat provided relief. (*Id.*) PAC Halkett prescribed Percocet for pain and instructed him to return in one week. (Tr. 411.)

On October 10, 2008, Mr. Sullivan followed up with PAC Halkett. (Tr. 407-08.) PAC Halkett noted that Mr. Sullivan continued to have low back pain, was taking 2.5 Percocet tablets daily, and using a heating pad. (Tr. 407.) Mr. Sullivan reported that he was not ready to go back to work as a programmer due to discomfort with walking, although he could sit with less discomfort. (*Id.*) On physical exam, PAC Halkett noted that Mr. Sullivan's forward flexion was very limited, he had bilateral lateral flexion to his knees, and his extension was within normal limits. (Tr. 407.) PAC Halkett reviewed x-rays of Mr. Sullivan's lower spine,[12] refilled the Percocet, prescribed Robaxin and Lidoderm Patches, and referred Mr. Sullivan for physical therapy.[13]

---

[12] The x-rays are not in the Administration Record. On June 30, 2009, Dr. Price referred to the October 2008 x-rays and noted that they showed "mild L2-3 and L5-S1 disk degeneration." (Tr. 343.)

[13] Mr. Sullivan attended two physical therapy sessions with Mandie D. Majerus, PT, MSPT, OCS, CSCS at Redmond Physical Therapy. (Tr. 329-39.) PT Majerus discharged Mr. Sullivan after two sessions to a home exercise program and TENS unit. (Tr. 330.)

On June 30, 2009, Mr. Sullivan presented to Evergreen Orthopedic Clinic and was evaluated by J. Scott Price, M.D.  ( Tr. 342-43.)  Mr. Sullivan reported a history of worsening lumbosacral pain with all activities over the previous year, that it varied between a 5 and 8 out of a 10 in severity, and that lying down relieved the pain somewhat.  (Tr. 342.)  Dr. Price reviewed October 2008 lumbar spine AP (anteroposterior) and lateral films which showed "mild L2-3 and L5-S1 disk degeneration."  (Tr. 343.)  Dr. Price assessed that "[w]hile this could be representative of chronic nonspecific back pain perhaps related to a two-level mild disk degeneration, it could also be related to a more serious etiology such as an oncologic problem or a diskitis."  Dr. Price planned to obtain an MRI.  (*Id*.)

On July 3, 2009, Mr. Sullivan had an MRI of his lumbar spine.  (Tr. 346-47.) The MRI demonstrated "[m]ultilevel discogenic degenerative disease and facet arthropathy."  (Tr. 347.)

On July 14, 2009, Mr. Sullivan followed up with Dr. Price regarding the MRI results. (Tr. 340.)  Dr. Price noted that Mr. Sullivan's MRI "[did] not show any features concerning for malignancy or infection so our main reason for obtaining the scan [was] fortunately negative.[14] He does have some mild disk and facet degeneration which may well be the cause of his pain, but for that we would have him work with [a] physiatrist[.]  (*Id*.)  Dr. Price referred Mr. Sullivan to Northwest Spine and Sports.  (Tr. 340.)

On July 20, 2009, Mr. Sullivan presented to Northwest Spine & Sports Physicians, P.C., and was evaluated by Carolyn A. Marquardt, M.D.  (Tr. 362-70.)  Dr. Marquardt reviewed Mr. Sullivan's radiologic studies and performed a physical exam.  (*Id*.)  Dr. Marquardt's impression was that Mr. Sullivan had, *inter alia*, L5-S1 facet pain with underlying facet arthropathy, L5-S1 disc protrusion, additional lumbar protrusions, facet arthropathy at L4-5 and L3-4, and thoracic numbness in a T6 distribution.  (Tr. 363.)  She planned to obtain a thoracic

---

[14] Dr. Price also informed Mr. Sullivan he did not have a medical condition that required surgery.  (Tr. 362.)

MRI to rule out a cord compression and referred Mr. Sullivan to Dr. Packia Raj to administer bilateral L5-S1 facet injections.  (*Id.*)

On July 21, 2009, Mr. Sullivan had an MRI of the thoracic spine.  (Tr. 371-72.)  The overall impression was "[m]ild multilevel intervertebral degenerative disc changes of the thoracic spine with multilevel disc desiccation," "[n]o central canal narrowing or significant neural foraminal are evident," and "[n]o bone abnormalities identified.   No spinal cord abnormalities are evident."  (Tr. 372.)

On July 28, 2009, Mr. Sullivan presented to Dr. Raj for bilateral L5-S1 facet injections.  (Tr. 354-55.)  Thereafter, on August 12, 2009, Mr. Sullivan followed up with Dr. Marquardt regarding the facet injections.  (Tr. 352-53.)  Mr. Sullivan complained of continued thoracic pain and paresthesias;[15] however, he reported that the facet injections had dramatically relieved his lower back pain and that he was very pleased with his progress.  (*Id.*)  Dr. Marquardt assessed Mr. Sullivan with "L5-S1 facet arthropathy substantially reduced after the injections," "[t]horacic paresthesias of unknown etiology," and "[g]astrointestinal distention."   (Tr. 353.)  She planned to obtain a brain MRI with MS protocol and neurology consult.[16]  (*Id.*)

On May 21, 2013, Mr. Sullivan presented with an ear ache and to discuss pain with Jo Walker, M.D., of Totem Lake Family Medicine.  (Tr. 394.)  Mr. Sullivan reported, *inter alia*, that he had increased pain in his lumbar area and that he needed to lie down after walking for 10 minutes or loading the dishwasher.  (*Id.*)  He stated he was not interested in narcotics, had steroid injections in 2009 which helped temporarily, and that he used Naprosyn and Tylenol at

---

[15] Mr. Sullivan reported to Dr. Gaffield on September 12, 2012, that this "[u]nexplained paresthesias in his flanks in 2009" had resolved.  (Tr. 303.)

[16] The Administrative Record does not contain any medical record evidence that Mr. Sullivan followed up with either the brain MRI or a neurology consult.  The Administration Record also does not contain any evidence that Mr. Sullivan was diagnosed with MS or a central nervous system disorder.

night.  (*Id.*)  On physical exam Dr. Walker noted, *inter alia*, that Mr. Sullivan was in no apparent distress and that his neurologic exam was normal.  (*Id.*)  Dr. Walker listed Mr. Sullivan's current pain medications as Ibuprofen and Naproxen.  (*Id.*)

On June 4, 2013, Mr. Sullivan returned to Dr. Raj.  (Tr. 349-51.)  Mr. Sullivan reported that over the previous year his back pain had worsened such that he was unable to sit for any time or walk for any distance, and that he had become very inactive.  (Tr. 349.)  He rated his pain an 8 out of 10 in severity.  (*Id.*)  He told Dr. Raj that lying down, applying heat, and taking anti-inflammatories helped his pain somewhat.  (*Id.*)  Dr. Raj reviewed Mr. Sullivan's radiologic studies from 2009 and 2012 and determined that there was "some significant spondylosis and osteopenia, as well as a significant compression fracture seen at L1 that was not present in 2009."  (Tr. 350.)  Dr. Raj's impression was mechanical back pain, compression fracture of uncertain etiology, lumbar spondylosis, and lumbar disc degeneration.  (*Id.*)  Dr. Raj planned to obtain a bone scan and DEXAscan to assess for significant inflammation and osteoporosis/osteopenia.  (*Id.*)  Dr. Raj recommended pool therapy and a vocational/ergonomic workstation assessment.  (*Id.*)  Dr. Raj opined that he believed Mr. Sullivan's pain was real and that his symptoms were preventing him from being capable of gainful employment until things were addressed and improved.  (Tr. 351.)  Dr. Raj also opined that "I think if we could get these issues worked on and get his flexibility and strength improved, then he likely would be able to return to gainful employment."  (*Id.*)

On November 13, 2013, Dr. Walker prepared a *Physician Opinion Re: Effect of Pain on Individual's Ability to do Work-Related Activities*.  (Tr. 420.)  Dr. Walker opined (1) that she believed Mr. Sullivan's complaints of pain; (2) that objective evidence, including imaging studies that revealed a vertebral compression fracture, degenerative joint disease and spondylosis

demonstrated the cause of Mr. Sullivan's pain; and (3) that Mr. Sullivan's pain would substantially interfere with the attention and concentration needed to perform even simple work tasks for "34% to 66% of an 8-hour working day." (*Id.*)  Dr. Walker indicated she relied on Mr. Sullivan's medical records prior to December 31, 2012, as the basis of her opinion. (*Id.*)

On January 21, 2014, Dr. Marquardt referred Mr. Sullivan for a bone mineral density test and stated that the indications were "[d]isorder of bone, unsp. ([o]steopenia), [c]losed fracture of lumbar spine with spinal cord injury." (Tr. 423.)  The results demonstrated normal bone mineral density in Mr. Sullivan's spine, and low bone mineral density (osteopenia) in his left hip, femoral neck, and left arm.[17] (Tr. 422-23.)

### 2.   State Agency Opinions

### a.   Gary Gaffield, D.O.

On September 12, 2012, State agency examining medical consultant Gary Gaffield, D.O., evaluated Mr. Sullivan as part of the Administration's initial review of Mr. Sullivan's disability claim. (Tr. 302-07.)  Dr. Gaffield reviewed the Adult Disability Form (SSA 3368), took a medical and social history, and physically examined Mr. Sullivan. (*Id.*)  Dr. Gaffield found that Mr. Sullivan had "[r]estricted lumbar motion without spasm or crepitus.  There were no trigger points.  Straight leg was negative both sitting and supine.  Neurologically intact." (Tr. 306.)  He diagnosed Mr. Sullivan with low back pain and determined that he had the functional capacity

---

[17] The results demonstrated that Mr. Sullivan had a T-score of 1.121 and a Z-score of 0.6 for the bone mineral density of his spine.  (Tr. 422.)  The T-score shows the amount of bone compared with a young adult of the same gender with peak bone mass; the Z-score shows the amount of bone compared with other people in your age group of the same size and gender.  http://www.radiologyinfo.org/en/info.cfm?pg=dexa.  A score above -1 is considered normal.  *Id.*  The results demonstrated that Mr. Sullivan had a T-score of -1.5 and a Z-score of -1.1 for the bone mineral density of his left hip; a T-score of -1.6 and a Z-score of -0.7 for the bone mineral density of his femoral neck; and a T-score of -2.2 and a Z-score of -1.5 for his left arm.  (Tr. 422.)  A score between -1 and -2.5 is classified as osteopenia (low bone mass).  http://www.radiologyinfo.org/en/info.cfm?pg=dexa.

for light work,[18] but that Mr. Sullivan's "postural activities [could] be performed occasionally,"[19] and that "[h]e would be advised to avoid on a frequent basis climbing more than a single flight of stairs, steep incline planes, obstacles in his pathway, [and] irregular surfaces due to his potential for impaired balance and his back status."  (*Id.*)

> **b.**     **Radiologic Consultative Exam – Initial Review**

On September 12, 2012, Mr. Sullivan underwent radiologic studies of his lumbar, thoracic and cervical spine due to reported neck and back pain as part of the Administration's initial review of his disability claim.  (Tr. 310, 395-98.)  The lumbar spine studies demonstrated that Mr. Sullivan had an "L1 compression fracture with approximately 25% anterior vertebral body height loss" and "mild degenerative of the lumbar spine."  (Tr. 395.)  The compression fracture was described as "probably old" given the associated degenerative changes at that level. (*Id.*)  The thoracic spine studies demonstrated "[m]ild degenerative changes" and "[s]uggested disc space calcifications" with "CPPD[20] arthropathy."  (Tr. 396.)  The cervical spine studies demonstrated "[m]ild degenerative changes" and "[g]eneralized osteopenia."  (Tr. 397.)

> **c.**     **Radiologic Consultative Exam - Reconsideration**

On January 24, 2013, Mr. Sullivan underwent radiologic studies of, *inter alia*, his lumbosacral spine and thoracic spine as part of the Administration's reconsideration of his disability claim.    (Tr. 311, 312-16.)    The radiologic studies of his lumbosacral spine

---

[18] The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  SSR 83-10, 1983 WL 31251, at *5.  Even though the weight lifted in a particular light job may be very little, a job is in the light work category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs.  *Id.*

[19] Postural limitations include a claimant's ability to climb, balance, stoop, kneel, crouch and crawl.  SSR 85-15, 1985 WL 56857, at *6-7.

[20] Calcium pyrophosphate dehydrate disease.  http://www.arthritis.org/about-arthritis/types/calcium-pyrophosphate-deposition-disease-cppd.

demonstrated "[m]oderate old L1 compression fracture, not seen on prior exam" and "[s]table

mild degenerative disk disease at L1-L2 and L5-S1 with face arthropathy at L5-S1."  (Tr. 312.)

The radiologic studies of his thoracic spine demonstrated "[m]ild spondylosis."  (Tr. 316.)

### d.  Charles Wolfe, M.D.

On January 29, 2013, State agency nonexamining medical consultant Charles Wolfe,

M.D., reviewed Mr. Sullivan's medical records at reconsideration.  (Tr. 128-30.)  Dr. Wolfe

assessed that Mr. Sullivan was capable of medium work[21] with postural limitations in climbing

and stooping.[22]  (Tr. 129.)

### e.  Peter M. Schosheim, M.D.

On October 1, 2013, orthopedist medical expert Peter M. Schosheim, M.D., appeared at

the continued administrative hearing and provided expert testimony.  (Tr. 32-39.)  Dr. Schosheim

testified that he reviewed Mr. Sullivan's medical records, including the most recent radiologic

studies from September 12, 2012.  (Tr. 34.)  Mr. Schosheim summarized his review and testified

in relevant part as follows:

> The records indicate even prior to the onset date of August 1, 2010, that the
> claimant was suffering from mechanical back pain, meaning severe lower back
> pain with some minimal leg pain but the majority of the issues were in his lower
> back.  He had plain x-rays done back in 2010[23] that did show an old compression
> fracture at L1.  There was a workup done to determine what the cause of the L1
> compression fracture and I don't believe they ever found any specific reason, i.e.,
> there was no, thank God, any tumor or any kind of severe osteoporosis that was

---

[21] The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  SSR 83-10, 1983 WL 31251, at *6.  A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.  *Id.*

[22] Dr. Wolfe assessed that Mr. Sullivan could frequently climb ladders, ropes and scaffolds, and frequently stoop. (Tr. 129.)

[23] In fact, the record reflects that X-rays done in 2012 demonstrated an L1 compression fracture that was probably old.  (Tr. 395.)

causing him to have a fracture.[24]   The claimant also had MRI scans of his lumbar spine in July of 2009, which showed that he had degenerative disc disease, L1-L2, L4-L5, L5-S1.   There was also mild arthritic changes of facet joint indicating mild arthritis as well as the degenerative disc disease.  . . .  In conclusion, we have an individual who on physical examination has decreased range of motion for his back, no significant neurologic findings of strength deficits, reflux [sic] changes, or sensory changes in his lower extremities with a diagnosis of an old compression fracture and degenerative disc disease of his lumbar spine.  Your honor, based on these diagnos[es], the claimant would not meet or equal a listing with regard to Social Security.  . . .  That being said, his residual functional capacity has been significantly impaired based on the objective findings in this record.

(Tr. 35-36.)  Dr. Schosheim assessed that Mr. Sullivan could engage in sedentary work[25] with postural limitations in climbing, balancing, kneeling, crouching, crawling and stooping.[26]   (Tr. 36.)  He further assessed that Mr. Sullivan would need to avoid all exposure to vibration, hazardous machinery and unprotected heights.  (*Id.*)

### B.   Issues Presented

Mr. Sullivan asserts five arguments in support of an immediate award of benefits, or in the alternative reversing and remanding his case, as follows: (1) the ALJ erred in her duty to develop the record; (2) the ALJ failed to conduct a full and fair hearing; (3) the ALJ erred by not including certain nonexertional limitations in her RFC determination; (4) the ALJ provided an inaccurate and incomplete hypothetical question to the VE; and (5) the ALJ's credibility findings

---

[24] On July 14, 2009, Dr. Price noted that Mr. Sullivan's MRI of his lumbar spine "[did] not show any features concerning for malignancy or infection so our main reason for obtaining the scan [was] fortunately negative. (Tr. 340.)

[25] The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  SSR 83-10, 1983 WL 31251, at *5.  Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties.  *Id.*  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *Id.*  Periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.  *Id.*

[26] Dr. Schosheim assessed that Mr. Sullivan could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; and could occasionally balance, kneel, crouch, crawl, and stoop.  (Tr. 38.)

are not closely and affirmatively linked to substantial evidence.  The Court will address each argument in turn.

### 1.   Duty to Develop Record

Mr. Sullivan argues the ALJ failed in her duty to develop the record as to three issues. First, Mr. Sullivan contends that the ALJ's duty to develop the record was triggered when she recognized that an intake form documenting Dr. Raj's physical exam of Mr. Sullivan was missing from Dr. Raj's treatment notes.[27]  (Doc. 21 at 9, Doc. 28 at 1-2.)  Second, Mr. Sullivan contends that the ALJ's duty to develop the record was triggered when she received the results of a DEXAscan bone density test because it explicitly identified the presence of a spinal cord injury.  (Doc. 21 at 9, Doc. 28 at 2-3.)  Third, Mr. Sullivan contends that his combined and rare medical symptoms supported the presence of an underlying systemic problem such that it was incumbent upon the ALJ to develop the record before she could make a factually correct and impartial ruling.  (Doc. 21 at 14-18, Doc. 28 at 7-8.)  The Commissioner asserts that the ALJ did not fail in her duty to fully develop the record because claimant's counsel represented that the record was complete and ready for adjudication, that Mr. Sullivan has failed to show how any alleged missing records were a material issue to the disability determination decision, and that it is not the ALJ's role to diagnose unknown medical conditions that are elusive even to Mr. Sullivan's own healthcare providers.  (Doc. 24 at 10-12, 16.)

### a.   Dr. Raj's Treatment Notes

The ALJ did not fail in her duty to develop the record by not recontacting Dr. Raj.  Here, Dr. Raj diagnosed Mr. Sullivan with severe mechanical back pain, tight hamstrings, and

---

[27] Dr. Raj's treatment notes included a complete history of Mr. Sullivan's present illness, his review of the imaging studies, his impressions and plans, and his discussion notes.  (Tr. 349-51.)  Dr. Raj's treatment notes did not include a referenced intake form that documented his physical exam.  (Tr. 350.)

significant facet arthropathy.  (Doc. 351.)  He opined that Mr. Sullivan's symptoms were likely preventing him from being capable of gainful employment, but that if his strength and flexibility were worked on and improved, he would likely be able to return to gainful employment.  (Tr. 351.)   As such, he opined on an issue reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(1) and 416.927(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . .  A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.")   When a treating source opines on an issue reserved for the Commissioner, the rules require that an ALJ will make every reasonable effort to recontact treating sources for clarification when "the bases for such opinions are not clear."  SSR 96-5, 1996 WL 374183, at *2.  Further, if the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.  *Id.*  Tenth Circuit case law instructs that an ALJ need only recontact a treating source for clarification "[i]f evidence from the claimant's treating doctor is inadequate to determine if the claimant is disabled."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir 2004); *see also White v. Barnhart*, 298 F.3d 903, 908 (10th Cir. 2001) (the ALJ's duty to recontact the treating physician is triggered where the information received is inadequate and so incomplete that it cannot be considered).  Finally, under the current regulations, evidence, including medical opinions, is considered insufficient when it does not contain all the information needed to make a determination or a decision whether a claimant is disabled.  20 C.F.R. §§ 404.1520b and 416.920b.  In that case, an ALJ *may* recontact a treating/medical source, *inter alia*, if after

weighing all the evidence she cannot reach a conclusion about whether a claimant is disabled. 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c)(1).

Applying the relevant rules, regulations and law here, the ALJ did not have a duty to recontact Dr. Raj.  Here, the ALJ stated her understanding of the bases for Dr. Raj's opinion; *i.e.,* he found the MRI findings to be more severe than the radiologists who interpreted them, and Dr. Raj believed Mr. Sullivan's subjective reports of disabling pain which she found to be not entirely credible.  (Tr. 23.)  As such, the ALJ was under no obligation to recontact Dr. Raj for clarification.  SSR 96-5, 1996 WL 374183, at *2.  The ALJ also evaluated all the evidence in the case record, as she was required to do, and determined that Dr. Raj's opinion was not supported by the record as a whole (Tr. 20-24).  *Id.*  Finally, although the ALJ noted the lack of exam results or any specific findings regarding Mr. Sullivan's functional abilities in Dr. Raj's treatment notes, she nonetheless had all the information she needed from Dr. Raj to make a determination that Mr. Sullivan was not disabled.  *Robinson*, 366 F.3d at 1084; 20 C.F.R. §§ 20 C.F.R. 404.1520b(c) and 416.920b(c).  The ALJ properly evaluated Dr. Raj's opinion applying correct legal standards and provided good reasons for according it minimal weight.[28]

For these reasons, the ALJ did not err in her duty to develop the record as to Dr. Raj's opinion.

### b.    <u>DEXAscan Bone Density Results</u>

The ALJ did not fail in her duty to develop the record when she received the results of Mr. Sullivan's DEXAscan bone density test.  A claimant bears the burden of proving his disability and must do so by furnishing medical and other evidence of the existence of his disability.  *Branum v. Barnhart*, 385 F.3d 1268, 1271-72 (10th Cir. 2004).  The ALJ nonetheless has a basic obligation to ensure that an adequate record is developed during the disability hearing

---

[28] *See* Section IV.B.2.b., *infra.*

consistent with the issues raised.  *Id.*  Further, although an ALJ has a duty to develop the record even where, as here, a claimant is represented by an attorney, "[s]everal preconditions inform" that duty.  *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009).  Under normal circumstances, the ALJ may reasonably rely on "counsel to identify the issue or issues requiring further development."  *Branum*, 385 F.3d at 1271.  Moreover, a claimant need not only "raise" the issue he seeks to develop, but that issue "on its face, must be substantial."  *Hawkins*, 113 F.3d at 1167.  "Specifically, the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists."  *Flaherty*, 515 F.3d at 1071.

On June 4, 2013, Dr. Raj noted he planned to obtain a DEXAscan to assess whether osteoporosis and/or osteopenia was the cause of Mr. Sullivan's L1 compression fracture identified by x-ray on September 12, 2012.  (Tr. 350.)  On January 21, 2014, Mr. Sullivan underwent a DEXAscan bone density test.[29]  (Tr. 422-23.)  The report states that the *indications* for the test were "[d]isorder of bone, unsp ([o]steopenia), [c]losed fracture of lumbar spine with spinal cord injury."  The *results* demonstrated that Mr. Sullivan's spine bone mineral density was normal.[30]  As such, Mr. Sullivan's reliance on the indications for having the bone density test as evidence of a spinal cord injury is completely misplaced.  Additionally, neither Mr. Sullivan nor his attorney raised the issue of a spinal cord injury for further development that was separate and distinct from the inquiry associated with the compression fracture that was already identified and considered in the ALJ's determination that Mr. Sullivan was not disabled.  Finally, there is nothing in the record *on its face* to suggest that this issue was substantial or that there was a reasonable possibility that a severe impairment existed based on a spinal cord injury.

---

[29] The DEXAscan test indicates that Dr. Marquardt ordered the test.  (Tr. 422.)

[30] *See* fn. 17, *supra.*

For these reasons, the ALJ did not err in failing to develop the record as to this issue. *Wall*, 561 F.3d at 1063.

### c.   <u>Other Medical Conditions</u>

Mr. Sullivan argues that Dr. Marquardt's reference to an "unusual constellation of symptoms" on July 20, 2009, was indicative of an "indeterminate systemic problem underlying his clinical presentation," also known as SWAN (Syndrome Without a Name). (Doc. 21 at 4, 15-18, Doc. 28 at 7-8.) Mr. Sullivan contends that although extensive diagnostic procedures were unable to identify his systemic condition, its presence was nonetheless concurred in by Dr. Raj[31] and was supported by multiple items of evidence in the medical record, namely his L1 compression fracture, his subsequent diagnosis of osteoporosis,[32] and the results of his DEXAscan.[33] (*Id.* at 4-5, 15-17.) Mr. Sullivan argues that given all of the medical evidence, the ALJ at a minimum "knew prior to her ruling that Mr. Sullivan's SWAN was a virtual statistical certainty" and that given the "extreme rarity of his symptoms," the ALJ had a duty to investigate further. (Doc. 21 at 17-18.) The Court is not persuaded. A claimant's statements about symptoms are not enough to establish that there is a physical impairment. 20 C.F.R. §§ 404.1528(a) and 416.928(d). Moreover, there is nothing in the record *on its face* to suggest that this issue was substantial or that there was a reasonable possibility that SWAN existed.

---

[31] Mr. Sullivan asserts that Dr. Raj concurred in the presence of a systemic condition because he noted on June 4, 2013, that an infiltrative process, *inter alia*, could possibly have caused Mr. Sullivan's compression fracture. (Tr. 351.) Dr. Raj planned to "[c]heck general lab work to assess for any underlying infiltrative process." (Tr. 350.) The Administration Record, however, contains no evidence of subsequent lab work or that an infiltrative process was diagnosed as the cause of Mr. Sullivan's compression fracture.

[32] Radiologic studies of Mr. Sullivan's cervical and thoracic spine on September 12, 2012, indicated generalized *osteopenia*. (Tr. 397.) On June 4, 2013, Dr. Raj indicated he was going to obtain a DEXAscan to "assess for osteoporosis and osteopenia." (Tr. 350.) On January 21, 2014, the DEXAscan record noted that Mr. Sullivan was assessed with clinical osteoporosis. (Tr. 422.) The DEXAscan results indicated normal bone mineral density in his spine, and *osteopenia* (low bone mineral density) in Mr. Sullivan's left hip, femoral neck, and left arm. (Tr. 422-23.)

[33] *See* fn. 17, *supra*.

*Flaherty*, 515 F.3d at 1071.  Finally, neither Mr. Sullivan nor his attorney raised the issue of SWAN for further development.  *Branum*, 385 F.3d at 1271; *Hawkins*, 113 F.3d at 1167.

For these reasons, the ALJ did not err in failing to develop the record as to this issue. *Wall*, 561 F.3d at 1063.

### 2.   **Medical Evidence**

Mr. Sullivan next argues the ALJ failed to conduct a full and fair hearing because she failed to evaluate and weigh all of the medical opinions, used only portions of those medical opinions that supported her decision while ignoring those that were contrary, and ignored particular findings within the medical reports that supported his complaints of disabling pain. (Doc. 21 at 10-18, Doc. 28 at 3.)   The Commissioner contends that the ALJ reasonably discounted the opinions of Dr. Raj and Dr. Walker, and that she was not required to discuss every piece of evidence.  (Doc. 24 at 12-17.)

The record must demonstrate that the ALJ considered all of the evidence.  *Clifton*, 79 at 1009; *see also* 20 C.F.R. §§ 404.1527(b) and 416.927(b) (we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive).  "An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."  *Hamlin*, 365 F.3d at 1215.   "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion."  *Id.* (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[34]   An ALJ is required to give controlling weight to the opinion of a treating physician if is it supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

---

[34] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson*, 366 F.3d at 1084.  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."  *Hamlin*, 365 F.3d at 1215.  "An opinion found to be an examining rather than treating medical-source opinion may be dismissed or discounted . . . but that must be based on an evaluation of all of the factors set out in the cited regulations and the ALJ must 'provide specific, legitimate reasons for rejecting it.'"  *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (quoting *Doyal v. Barnhart*, 331 F.3d 758, 764 ((10th Cir. 2003)).  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion.*"  *Langley*, 373 F.3d at 1121 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis in original)).

### a.      PAC Paul Halkett and Physical Therapist Mandie Majerus

Mr. Sullivan argues the ALJ ignored the findings of PAC Paul Halkett and Physical Therapist Mandie Majerus.  (Doc. 21 at 10-11.)  PAC Halkett and PT Majerus are considered other medical sources.[35]  Evidence from other medical sources may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function."  *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2.  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an

---

[35] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist.  SSR 06-03p, 2006 WL 2329939, at *2.

'acceptable medical source'[36] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.  In this case, neither PAC Halkett nor PT Majerus provided an opinion regarding the severity of Mr. Sullivan's low back pain.  (Tr. 329-39, 407-11.)  Additionally, neither of them prepared a functional assessment regarding the impact of Mr. Sullivan's low back pain on his ability to do work related activities.  (*Id.*)  Thus, their records do not conflict with the ALJ's RFC and the need for express analysis is weakened.  *See Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004) (explaining that when the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened).

The Court's review "is focused first and foremost on whether the ALJ's decision is supported by substantial evidence and we conduct that inquiry via a meticulous examination of the 'record as a whole.'"  *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009) (internal citations omitted).  The Court has done so here.  Further, the AL is not required to "discuss every piece of evidence."  *Id. (*citing *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007).

For these reasons, the ALJ did not err in not discussing PAC Halkett's and PT Majerus' records.

### b.    Dr. Raj

Mr. Sullivan argues that Dr. Raj's opinion was entitled to deference and that the ALJ improperly dismissed his opinion based on her perception that Dr. Raj relied heavily on Mr. Sullivan's subjective complaints.  (Doc. 21 at 11.)  Mr. Sullivan further argues that if the ALJ found Dr. Raj's report to be inadequate she was required to recontact him for additional information.  (*Id.*)  As previously discussed, Dr. Raj opined on an issue reserved to the Commissioner.  *See* Section IV.B.1.a., *supra.*  Treating source opinions on issues reserved to the

---

[36] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1.

Commissioner are never entitled to controlling weight or special significance.  SSR 96-5p, 1996 WL 374183, at *2.  Similarly, any opinion on an issue reserved to the Commissioner is not given any special significance.  20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3). That said, the ALJ was still required to provide an evaluation of Dr. Raj's opinion and give good reasons for the weight she accorded.  *Hamlin*, 365 F.3d at 1215.  The ALJ did so here.  The ALJ explained that the treatment relationship between Dr. Raj and Mr. Sullivan was only recently reestablished and had been infrequent.  (Tr. 23.)  The record supports this finding and it is a valid reason for according less weight to Dr. Raj's opinion.[37]  *See* 20 C.F.R. §§ 404.1527(c)(2)(i) and 416.927(c)(2)(i) (the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion).  The ALJ explained that Dr. Raj's interpretation of the MRI findings conflicted with the radiologists' impressions and Dr. Schosheim's expert opinion.  (Tr. 23.)  The record supports these findings they and are valid reasons for according less weight to Dr. Raj's opinion.[38]  *See* 20 C.F.R. §§ 404.1527(c)(4) and 416.927(c)(4) (the more an opinion is consistent with the record as a whole, the more weight we will give that opinion).  Additionally, the ALJ explained that Dr. Raj failed to discuss how Mr. Sullivan had previously experienced significant relief from steroid injections and that Dr. Raj appeared to have relied largely on Mr. Sullivan's subjective reports, which the ALJ found to be problematic and not entirely credible.  (Tr. 23-24.)  The record supports these

---

[37] Mr. Sullivan saw Dr. Raj only twice in four years – once for bilateral L5-S1 facet injections on July 28, 2009, and a second time four years later on June 4, 2013, for evaluation of his back pain.  (Tr. 349-51, 354-55.)

[38] The radiologists interpreting Mr. Sullivan's various x-ray and MRI studies consistently characterized the findings as "mild."  (Tr. 312, 316, 343, 372, 395-97.)  Additionally, Dr. Schosheim provided expert testimony based on the objective findings in the record and opined that while Mr. Sullivan's RFC was significantly impaired, he remained capable of sedentary work with certain postural and environmental limitations.  (Tr. 35-36.)

findings,[39] (Tr. 352-53), and for reasons discussed more fully below, the Court will not disturb the ALJ's credibility findings.  *See*, Section IV.E., *infra*.

For these reasons, the Court finds that the ALJ applied the correct legal standard to evaluate Dr. Raj's opinion and provided specific, legitimate reasons that are supported by substantial evidence for according his opinion minimal weight.  Further, because the ALJ was able to determine that Mr. Sullivan was not disabled based on the record as a whole, the ALJ did not err in not recontacting Dr. Raj for additional information.  20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c)(1).

### c.    Dr. Walker

Mr. Sullivan argues that the ALJ failed to acknowledge Dr. Walker as his treating physician and improperly discounted her opinion based on her perception that Dr. Walker relied heavily on Mr. Sullivan's subjective complaints.  (Doc. 21 at 11-13.)  Mr. Sullivan also argues that the ALJ had a duty to seek additional information from Dr. Walker regarding the basis of her opinion.  (*Id.*)  Assuming *arguendo* that Dr. Walker was a treating physician,[40] the Court finds the ALJ properly evaluated Dr. Walker's opinion and provided specific, legitimate reasons for

---

[39] On August 12, 2009, Mr. Sullivan reported that the facet injections dramatically relieved his lower back pain. (Tr. 352-53.)  On September 12, 2012, Mr. Sullivan reported to Dr. Gaffield that he had not pursued subsequent injections because he had done research on steroids and believed that the previous steroid injections had caused his sudden onset of diabetes.  (Tr. 302.)  The record, however, demonstrates that Mr. Sullivan was diagnosed with diabetes in June 2008, a full year before he had steroid injections.  (Tr. 355, 416.)  That aside, and contrary to what he told Dr. Gaffield, Mr. Sullivan testified on October 1, 2013, that he had not pursued subsequent steroid injections because of the cost and he had planned to get more injections if he had been able to secure employment with health insurance benefits.  (Tr. 68, 78.)  Mr. Sullivan also testified that he was not opposed to having steroid injections. (Tr. 73.)  On April 6, 2016, Mr. Sullivan represented in his briefing that based on the 2012 diagnosis of the vertebral compression fracture and osteoporosis, steroid injections would have been contraindicated and ineffective treatment. (Doc. 21 at 23.)

[40] The record demonstrates that Mr. Sullivan had only minimal contact with Dr. Walker.  Mr. Sullivan asserts that Dr. Walker routinely managed his medical condition, observed him "roughly a dozen times over a period of five years," and regularly prescribed Tramadol to treat his chronic pain.  (Doc. 21 at 12.)  The record does not support his assertions.  There is only *one* treatment record in the Administrative Record prepared by Dr. Walker.  (Tr. 394.)  The only other record prepared by Dr. Walker is the assessment form she completed on November 13, 2013, regarding the effect of pain on Mr. Sullivan's ability to do work-related activities.  (Tr. 420.)  The brevity and infrequency of Mr. Sullivan's relationship with Dr. Walker are valid reasons for according minimal to no weight to her opinion.  20 C.F.R. §§ 404.1527(c)(2)(i) and 416.927(c)(2)(i).

according it minimal to no weight. *Hamlin*, 365 F.3d at 1215. The ALJ explained that there was nothing in the evidence showing that the claimant had symptoms that would frequently interfere with his ability to perform even simple work tasks or that he had a mental impairment. (*Id.*) The ALJ further explained that

> Claimant's own daily activities conflict with Dr. Walker's opinion, for he testified at his first hearing that he reads complex books both quickly and simultaneously, surfs the internet, and answers technical questions in an online form [sic], among other activities that require significant concentration, persistence and pace. (1st Hearing Recording). Dr. Walker's opinion is also both brief, vague and conclusory, and merely refers to the treatment notes and x-rays prior to December 31, 2012, without assigning the claimant any specific limitations. Instead, Dr. Walker, like Dr. Raj, appears to have relied heavily on the claimant's subjective report of symptoms in forming his/her opinion; a problem, because as discussed above, the claimant is less than fully credible.

(*Id.*) The record supports the ALJ's findings.

The ALJ's finding that Dr. Walker's assessment was inconsistent with the record as a whole is supported by substantial evidence. 20 C.F.R. §§ 404.1527(c)(4) and 416.927(c)(4). On September 10, 2012, Mr. Sullivan reported on his Adult Function Report that he could pay attention for as long as he needed to. (Tr. 252.) On July 9, 2013, Mr. Sullivan testified that although reading technical material had become more difficult for him, he nonetheless did so, and also followed "geek news" and participated in an online technical forum helping people solve technology-related problems. (Tr. 84-86.) Mr. Sullivan testified that he was currently and simultaneously reading a science fiction novel titled *Contact*, while also reading Carl Jung's autobiography titled *Memories, Dreams and Reflections*, while also reading an oral history of the Kennedy assassination titled *No More Silence*. (Tr. 101-03.) Mr. Sullivan testified that *No More Silence* was "actually fairly heavy reading." (Tr. 103.) Mr. Sullivan testified he read fast and could finish a novel in two to three days. (Tr. 102.) Finally, no other healthcare provider opined or assessed that Mr. Sullivan's pain affected his ability to concentrate or attend to work-related

tasks, nor did Mr. Sullivan complain to any other healthcare provider that his pain affected his ability to concentrate.[41]   The lack of consistency between Dr. Walker's assessment and the record as a whole is a valid reason for the ALJ to accord minimal to no weight to Dr. Walker's opinion.  20 C.F.R. §§ 404.1527(c)(4) and 416.927(c)(4).

The ALJ's finding that Dr. Walker's assessment was not supported because it was brief, vague and conclusory is supported by substantial evidence.   Dr. Walker opined that Mr. Sullivan's pain would substantially affect his concentration and attention and that he would experience symptoms severe enough to interfere with his ability to perform even simple work tasks 34% to 66% of an 8-hour working day.  (Tr. 420.)  In making this finding, Dr. Walker represented that she relied on treatment notes and x-rays "prior to 12/31/2012."[42]   (*Id*.)  By merely pointing to these records, and in the absence of any functional assessment in those records, Dr. Walker failed to explain how the records prior to December 31, 2012, supported her assessment.   Moreover, the records demonstrate that during the period at issue; *i.e.,* prior to December 31, 2012, Mr. Sullivan had not sought any treatment for his back pain for three and a half years, since July 28, 2009, when he had bilateral L5-S1 facet injections that dramatically relieved his lower back pain.  (Tr. 352-53, 354-55.)  The lack of supportability is a valid reason for the ALJ to accord minimal to no weight to Dr. Walker's opinion.   20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3).

The ALJ's finding that Mr. Walker's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible is supported by substantial evidence.

---

[41] Mr. Sullivan reported to Dr. Gaffield that he lived alone, worked on his computer, and that he was able to bathe, dress himself, prepare food, read, watch television, care for his cat, maintain his home, and drive.  (Tr. 303.)

[42] The records prior to December 31, 2012, are sparse and none of them contain an assessment that Mr. Sullivan had nonexertional impairments that impacted his ability to do work-related activities.

For the reasons discussed more fully below, the Court will not disturb the ALJ's credibility findings. *See,* Section IV.E., *infra*.

Finally, the ALJ's duty to recontact a medical source is triggered when the information provided is inadequate to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c)(1). That is not the case here.

For these reasons, the Court finds the ALJ applied the correct legal standard to evaluate Dr. Walker's opinion and provided specific, legitimate reasons that are supported by substantial evidence for according her opinion minimal to no weight. *Hamlin*, 365 F.3d at 1215. Further, because the ALJ was able to determine that Mr. Sullivan was not disabled based on the record as a whole, the ALJ did not err in not recontacting Dr. Walker for additional information. 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c)(1).

### d.   Dr. Schosheim

Mr. Sullivan argues the ALJ accorded significant weight to Dr. Schosheim's opinion but improperly selected certain portions of his opinion while rejecting others without explanation. (Doc. 21 at 13, 19-21.) Specifically, Mr. Sullivan asserts that Dr. Schosheim testified that pain from impairments like his could be "very variable" and that "problems with focus and concentration are entirely consistent with his clinical observations." (*Id*. at 13) Mr. Sullivan also asserts that Dr. Schosheim testified that it would be reasonable for him to have problems with light-headedness or fatigue. (*Id.* at 20.)

The ALJ adopted in full Dr. Schosheim's opinion that Mr. Sullivan was capable of a reduced range of sedentary work. (Tr. 20, 36.) As such, the ALJ did not pick and choose from Dr. Schosheim's opinion. (Tr. 21.) *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking

only the parts that are favorable to a finding of nondisability.").  It was only *after* Dr. Schosheim

provided his opinion regarding Mr. Sullivan's RFC that Mr. Sullivan's then-counsel questioned

Dr. Schosheim and obtained testimony regarding the possibility of problems with concentration,

light-headedness and fatigue as follows:

> Q: Now, Dr. Showshime [sic], this – because of this compression fracture would this, this individual have problems with pain in your experience?
>
> A: Well, it's very variable because individuals who have compression fracture from the acute point usually within a period of six months, once the compression fracture heals, they usually don't have significant pain but it's variable.  There are some patients, due to some mild instability from the compression fracture, continue to have low back pain.  But again, that's very variable.
>
> Q: So would it be reasonable for this individual to have *occasional* difficulty with focus and concentration because of pain?
>
> A: It, it's possible.  I don't know if he's on any narcotic medication.  Let me see.
>
> Q: The claimant is currently taking Tramadol.
>
> A: Tramadol?  Well, that's not a narcotic medicine.  Yeah, I mean, it's possible.  Again, that, that's something that's subjective, and I really don't want to comment on it with regard to absolutes.
>
> Q: But it would be reasonable, though, would it not?
>
> A: That would be reasonable.  Yes.
>
> Q: Okay.  Now with – in individual's taking Tramadol, would they have any side effects with that medication?
>
> A: Sometimes they can get dizziness.
>
> Q: Okay.  No fatigue?
>
> A: The only problem is that from the record, and again, you know, there aren't significant number of treating records here but the records that I do see, I don't see that the claimant was having any side effects from the medications that he was taking or at least they didn't put them in the record.

Q:      Could Tramadol cause any kind of fatigue?

A:      It could.

Q:      Okay.  All right.  No further questions.

(Tr. 37-38.)  (Emphasis added.)

Mr. Sullivan misconstrued Dr. Schosheim's testimony.  Dr. Schosheim did not testify that "problems with focus and concentration are entirely consistent with his clinical observations" as Mr. Sullivan contends.  (Doc. 21 at 13.)  Instead, Dr. Schosheim testified that *assuming* you were an individual who had ongoing pain from a healed compression fracture, it is *possible* you could have *occasional* difficulty with focus and concentration because of pain.  (Tr. 38.)  As such, Dr. Schosheim's testimony regarding the qualified circumstances under which *occasional* difficulty with focus and concentration could occur does not support the level of daily and frequent difficulty with concentration and attention that Dr. Walker assessed and Mr. Sullivan claims.[43]  More significantly, however, Dr. Schosheim did not change his opinion regarding Mr. Sullivan's RFC on that basis.  As to the impact of Mr. Sullivan's use of pain medication on his ability to focus and concentrate and problems with lightheadedness and fatigue, Dr. Schosheim testified that an individual taking Tramadol could have difficulty with focus and concentration, but that it was subjective and he did not want to comment on it with regard to absolutes.  He further testified that someone taking Tramadol *may* experience dizziness and/or fatigue, but that there was no evidence in the record to support that Mr. Sullivan was having any

---

[43]  Mr. Sullivan argued in his Reply that this has been the primary basis of his disability all along – "the nonexertional limitations imposed on him by chronic pain and its consequences, most notably issues with persistence, concentration, and pace."  (Doc. 28 at 3.)

side effects from the medications he was taking.[44]  (Tr. 38-39.)  As such, Mr. Sullivan's reliance on Dr. Schosheim's testimony that side effects *may* occur when taking Tramadol to support his nonexertional impairments misconstrues Dr. Schosheim's testimony and is misplaced given the absence of evidence demonstrating that Mr. Sullivan was experiencing those side effects.[45] Further, Dr. Schosheim did not change his opinion regarding Mr. Sullivan's RFC on that basis.

For these reasons, the ALJ did not improperly pick and choose from Dr. Schosheim's opinion choosing only those parts favorable to her determination while ignoring others.

## C.    RFC

Mr. Sullivan argues the ALJ failed to include nonexertional limitations in her RFC determination related to his problems with focus, concentration, light-headedness and fatigue. (Doc. 21 at 19-21, Doc. 28 at 3-4.)  The Commissioner contends that the ALJ's determination that Mr. Sullivan remained capable of a reduced range of sedentary work was supported by substantial evidence, including multiple medical source opinions, the objective medical evidence, and Mr. Sullivan's daily activities.  (Doc. 24 at 6-9.)

Assessing a claimant's residual functional capacity is an administrative determination left solely to the Commissioner.  20 C.F.R. §§ 404.1546(c) and 416.946(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for

---

[44] The Court's review of the record demonstrates that separate and apart from Mr. Sullivan's testimony that he was taking Tramadol and/or Meloxicam, there is no evidence in the record that any healthcare provider prescribed either. Mr. Sullivan testified that his physiatrist, Dr. Raj, suggested and prescribed Tramadol and that he had only been taking it for a couple of weeks.  (Tr. 99, 104-05.)  However, Dr. Raj's records do not indicate that he discussed and/or suggested any medications to Mr. Sullivan and his notes affirmatively state that no medications were provided through his office.  (Tr. 350, 363.)  In his Motion, Mr. Sullivan represents that Dr. Walker "regularly and routinely prescribed Tramadol." (Doc. 21 at 12.)  Mr. Sullivan also testified that Dr. Walker prescribed Meloxicam. (Tr. 104.)  However, the one treatment note from Dr. Walker listed Mr. Sullivan's current medications as Ibuprofen and Naproxen.  (Tr. 394.)  Neither Tramadol nor Meloxicam are listed.  (*Id.*)

[45] Mr. Sullivan testified at the hearing that taking Tramadol left him "cognitively impaired" and that he did not feel safe driving.  (Tr. 106.)

assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (stating that some issues are administrative findings, such as an individual's RFC). In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2) and (3) and 416.945(a)(2) and (3). The ALJ must consider and address medical source opinions and must always give good reasons for the weight accorded to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-8p, 1996 WL 374184, at *7. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184 at *7. Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7). When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence. *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003).

The ALJ's RFC assessment is supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. Here, the ALJ's RFC assessment included an organized and thorough narrative of Mr. Sullivan's medical history, radiologic findings, medical source statements, and hearing testimony, and described how the evidence supported her

conclusions.   (Tr. 18-24.)   Further, the ALJ properly evaluated and weighed the medical evidence (Tr. 21-24) and explained why Dr. Walker's assessed nonexertional limitations were not adopted, which has been discussed at length herein.  *See* Section IV.B.2.c., *supra*.  The ALJ, therefore, sufficiently explained why she found that Mr. Sullivan's asserted nonexertional limitations were not supported by substantial evidence.  As such, any limitations were properly excluded from the ALJ's RFC.  *Id.*

The ALJ applied the correct legal standard in assessing Mr. Sullivan's RFC and it is supported by substantial evidence.

### D.        Inaccurate and Incomplete Question to the VE

Mr. Sullivan argues that the ALJ's hypothetical question to the VE failed to include his nonexertional limitations due to pain.   (Doc. 21 at 22.)   In the Tenth Circuit, hypothetical questions to a vocational expert need only include those limitations that the ALJ finds are established by substantial evidence.  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995). "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991.)   Here, as previously discussed, the ALJ properly evaluated and provided good reasons for the weight she accorded to the medical source opinions in this case.  *See* Section B.2., *supra.*   Because the ALJ properly found that Mr. Sullivan's asserted nonexertional impairments were not supported by substantial evidence, it was not error for the ALJ to have excluded these limitations from her hypothetical to the VE. *Evans*, 55 F.3d at 532.    The ALJ applied the correct legal standard when she posed her hypothetical to the VE and her findings were supported by substantial evidence.

### E.    Credibility

Mr. Sullivan argues that the ALJ's credibility findings are not closely and affirmatively linked to substantial evidence.  (Doc. 21 at 22-28, Doc. 28 at 8-11.)  The Commissioner contends that the ALJ articulated numerous legitimate reasons that supported her adverse credibility determination and that the Court should not disturb her credibility findings on appeal.  (Doc. 24 at 17-19.)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 16-3p, 2016 WL 1119029, at *9 ("it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'").

The Tenth Circuit has explained the framework for the proper analysis of a claimant's evidence of pain.  "A claimant's subjective allegation of pain is not sufficient in itself to establish disability."  *Thompson*, 987 F.2d at 1488 (citing *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988)).  Instead, "[b]efore an ALJ need consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain."  *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)).  If a claimant does so, then the ALJ must consider whether there is a "loose nexus" between the proven impairment and the subjective

complaints of pain.  *Id.*  Finally, if there is a loose nexus, the ALJ considers all of the evidence, both objective and subjective, to determine whether the pain was disabling.  *Id.*  Even if pain is not disabling, it is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant."  *Thompson*, 987 F.2d at 1491.

The ALJ determined that Mr. Sullivan had a severe impairment of degenerative disc disease.[46]  (Tr. 19.)  Thus, Mr. Sullivan proved by objective medical evidence the existence of a pain-producing impairment as he was required to do.  *Thompson*, 987 F.2d at 1488.  As such, the ALJ was required to determine whether there is a "loose nexus" between Mr. Sullivan's proven impairment and his subjective complaints, and then decide whether she believed him.  *Id.* at 1489.  The ALJ determined that Mr. Sullivan's impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  (Tr. 21.)  In determining the credibility of pain testimony, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.*  Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).

---

[46] Mr. Sullivan asserts that his medical records supported consistent and compelling evidence of conditions known to cause pain (degenerative disc disease, arthropathies, vertebral compression fracture, and calcium pyrophosphate deposition), along with multiple involuntary indicators associated with chronic pain (guarding, scoliosis, kyphosis). (Doc. 21 at 14.)

The ALJ's credibility findings are closely and affirmatively linked to substantial evidence.  First, the ALJ discussed the objective medical evidence.  She discussed Mr. Sullivan's consultative exam with Dr. Gaffield on September 12, 2012, wherein Dr. Gaffield noted that Mr. Sullivan was in no acute distress, used no assistive device, and exhibited no evidence of pain getting up from a chair or getting up and down from the exam table (Tr. 302, 305).  (Tr. 21.) Dr. Gaffield further noted that but for some restriction in his range of lumbar movement and balancing, Mr. Sullivan's physical exam was negative (Tr. 305-06).  (*Id*.)  She also discussed the most recent imaging of Mr. Sullivan's lumbar spine on January 24, 2013, that revealed a "moderate, old L1 compression fracture as well as *mild* degenerative disc disease at L1-L2 with facet arthropathy at L5-S1 that is stable" (Tr. 312).  (Tr. 21.)  The ALJ further noted that the "MRI of his thoracic spine from January 2013 shows only *mild* spondylosis" (Tr. 316).  (Tr. 22.) The record supports these findings and they are valid reasons for discounting Mr. Sullivan's credibility.  *See Thompson*, 987 F.2d at 1489 (in determining the credibility of pain testimony, the ALJ should consider such factors as the consistency or compatibility of nonmedical testimony with objective medical evidence).  Second, the ALJ discussed that Mr. Sullivan collected unemployment benefits during the time he alleged to be disabled.   (Tr. 22.) Mr. Sullivan collected unemployment benefits for nine months in 2011 and nine months in 2012 (Tr. 222), and completed job logs throughout this time identifying jobs he could perform (Tr. 76.)  The record supports this finding and it is a valid reason for discounting Mr. Sullivan's credibility. *See Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (unpublished) (finding it was entirely proper to find that claimant was not credible when she received unemployment benefits in good faith and reported she was able to work during the same time period she alleged to be disabled).   Third, the ALJ discussed the nature of Mr. Sullivan's daily activities as

inconsistent with his claim of disability, noting that Mr. Sullivan reported and/or testified that his daily activities included his ability to live independently, climb 15 stairs up and down in his apartment two to three times a day, complete his personal care without assistance, care for his cat, prepare his own meals, do at least one chore per day, drive, shop, and manage his money (Tr. 90-91, 247-54, 303).  (Tr. 22.)  The ALJ also discussed that Mr. Sullivan reported he was able to pay attention as long as he needed (Tr. 252), socialized over the phone and via internet chats (Tr. 251), and testified regarding his ability to read multiple books quickly on complex topics and participate in technical forums online (Tr. 85-86, 101-03).  (Tr. 22-23.)  The record supports these findings and they are valid reasons for discounting Mr. Sullivan's credibility.  *See Thompson*, 987 F.2d at 1489 (in determining the credibility of pain testimony, the ALJ should consider the nature of daily activities).  Finally, the ALJ discussed that Mr. Sullivan testified he applied for DSHS[47] health insurance in early 2013 (Tr. 70-73), but remained uninsured because he had not followed up on his application.[48]  (Tr. 23.)  The ALJ explained that Mr. Sullivan's inactivity to obtain health insurance infers that his physical impairment was not so severe that he was concerned about how he was going to receive medical care.  (*Id.*)  The record supports this finding and it is a valid reason for discounting Mr. Sullivan's credibility.  *See Thompson*, 987 F.2d at 1489 (in determining the credibility of pain testimony, the ALJ should consider the extensiveness of the attempts to obtain relief and the frequency of medical contacts).

Mr. Sullivan disputes the ALJ's credibility findings.  He argues that he applied for and received unemployment compensation benefits on the good faith belief that if he could get work, he could get additional facet injections allowing him to resume his work activities.  (Doc. 21 at

---

[47]  Washington State Department of Social and Health Services.

[48]  Mr. Sullivan testified that he thought he had to be found disabled before he would qualify for DSHS benefits. (Tr. 73.)

23-24.)  He argues that his ability to perform a limited range of discretionary daily activities does not establish his ability to engage in substantial gainful activity.  (*Id.* at 24.)  He argues that the ALJ ran roughshod over the English language by characterizing his mass market reading material as "complex," and that the ALJ incorrectly interchanged Mr. Sullivan's ability to read recreationally with his ability to conduct scientific research.  (*Id.* at 25.)  He argues that his participation in technical forums is an *ad lib* activity that he does on a voluntary basis and cannot be compared to the demands of a sustained work schedule.  (*Id.* at 26.)  He argues that he obtained medical insurance once it became affordable under the Affordable Care Act and that this fact directly contradicts the ALJ's finding that he was not motivated to secure health insurance.  (*Id.* at 26.)  Finally, Mr. Sullivan argues that his credibility should be substantiated by his (1) out-of-pocket expenditures for care and treatment in 2008, (2) the unanimous consent of his medical providers in their assessment and treatment of his pain, (3) his exhaustive search of efficacious drugs, including opiate analgesics and anti-inflammatories sufficient to cause internal bleeding; (4) his altered lifestyle; and (5) his willingness to risk potential kidney damage, stomach ulcers, paralysis, and skeletal compromise in order to relieve his pain.  (*Id.* at 27-28.)

The Court's review of the record demonstrates that Mr. Sullivan's representations regarding (1) his allegedly disabling medical condition, (2) his healthcare provider's view of his medical condition, and (3) the extensiveness of his attempts to obtain relief are not supported by the evidence.  Mr. Sullivan first sought care for his back pain in October 2008.  (Tr. 407-08, 410-11.)  He saw PAC Halkett only *twice* – on October 3, 2008, and on October 10, 2008.  (*Id.*)  Contrary to Mr. Sullivan's contention that PAC Halkett had him on an extended regimen of Percocet (Doc. 21 at 3, 10), PAC Halkett wrote *two* prescriptions for Percocet, one at the initial appointment and a refill at the second appointment.  (Tr. 405.)  Mr. Sullivan attended only *two*

physical therapy sessions on November 14, 2008 and November 18, 2008, after which he discharged to a home exercise program and provided an at-home TENS unit, at least initially, on a 30-day free trial.[49]  (Tr. 326, 330.)  Mr. Sullivan next sought medical care for low back pain *seven months* later during the summer of 2009 (Tr. 342-43), when MRI studies demonstrated mild degenerative changes in the lumbar and thoracic spine (Tr. 346-47, 371-72), and facet injections dramatically relieved his lower back pain (Tr. 352-53).[50]  *Three years later*, on September 12, 2012, Mr. Sullivan attended consultative exams as part of the Administration's initial review of his disability claim.  Radiology studies identified mild degenerative disc disease and an *old* L1 compression fracture[51] - a finding that Mr. Sullivan described as a catastrophic deterioration of his condition (Doc. 21 at 16).  (Tr. 351, 395.)  On that same date, however, Dr. Gaffield concluded that but for some restriction in his range of lumbar movement and balancing, Mr. Sullivan's physical exam was negative.   (Tr. 305-06.)   Despite the self-described "catastrophic" deterioration in his condition, Mr. Sullivan did not seek any treatment until *nine months* later, on May 21, 2013, when he saw Dr. Walker to discuss, *inter alia*, his pain.  (Tr. 394.)   Contrary to Mr. Sullivan's assertions that Dr. Walker routinely managed his medical condition, observed him "roughly a dozen times over a period of five years," and regularly prescribed Tramadol to treat his chronic pain (Doc. 21 at 12), this is the only treatment record authored by Dr. Walker in the Administrative Record.  (*Id*.) Moreover, Dr. Walker listed Mr. Sullivan's only medications as Naprosyn and Tylenol.  (*Id*.)  On June 4, 2013, Mr. Sullivan

---

[49] Mr. Sullivan represents he subsequently purchased the TENS machine at his own expense.  (Doc. 21 at 3.)

[50] Despite the benign objective evidence, Mr. Sullivan insists that his healthcare providers at this time were concerned about cancer, infection, multiple sclerosis, and/or disorders involving his central nervous system.  (Doc. 21 at 15, Doc. 28 at 5.)  In so doing, however, Mr. Sullivan fails to recognize that their concerns never gave rise to actual diagnoses of such conditions.

[51] Although the radiologist identified the L1 compression fracture as *old*, it was new since it was not identified on radiology studies from 2009.

returned to Dr. Raj, who was very sympathetic to and believed Mr. Sullivan's complaints about pain, but who nonetheless opined that if they worked on Mr. Sullivan's symptoms and his flexibility and strength were improved, *he would likely be able to return to gainful employment*. (Tr. 351.)  (Emphasis added.)  There was no follow up.  Instead, the record falls silent until *five months later*, when, on November 13, 2013, Mr. Sullivan obtained an assessment from Dr. Walker wherein she represented, without more, that Mr. Sullivan's disabling pain would substantially affect his ability to concentrate on even simple work tasks for up to two-thirds of the work day.  (Tr. 420.)

The summary of the evidence simply does not support Mr. Sullivan's conclusions about the dire nature and treatment of his medical condition, about the way his healthcare providers viewed his medical condition, about the impact of his medical condition on his ability to concentrate, or about the exhaustive and physically-endangering efforts and lengths he claims to have undergone to obtain care and treatment for his back pain.  For all of these reasons, and after examining the record as a whole, the Court is persuaded that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence and the Court will not disturb her findings.

## V.  Conclusion

For the reasons stated above, Mr. Sullivan's Motion to Reverse or Remand for Rehearing is **DENIED**.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**

40